1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        )   Case No. 2:20-cr-00146-WFN-1
3                                 )
                   Plaintiff,     )   June 7, 2023
4                                 )   Spokane, Washington
vs.                               )
5                                 )   Sentencing Hearing
JAIDEN GYVAN PETERSEN,            )
6                                 )   Pages 1 - 44
                   Defendant.     )
7    _____)

          BEFORE THE HONORABLE WM. FREMMING NIELSEN
8         SENIOR UNITED STATES DISTRICT COURT JUDGE

9    APPEARANCES:

10   For the Plaintiff:          ALISON L. GREGOIRE
                                 U.S. Attorney's Office
11                               920 W. Riverside Ave., Ste. 300
                                 P.O. Box 1494
12                               Spokane, Washington 99210

13   For the Defendant:          AMY H. RUBIN
                                 Federal Defenders of Eastern
14                               Washington & Idaho
                                 N. 10 Post St., Ste. 700
15                               Spokane, Washington 99201

16

17

18

19   Official Court Reporter:    Allison R. Anderson, RMR, CRR, CCR
                                 United States District Courthouse
20                               P.O. Box 700
                                 Spokane, Washington 99210
21                               (509) 458-3465

22

23

24
     Proceedings reported by mechanical stenography; transcript
25   produced by computer-aided transcription.

1    (Court convened on June 7, 2023, at 11:00 a.m.)

2        THE COURTROOM DEPUTY:  *United States of America versus*

3  *Jaiden Gyvan Petersen*, Case No. 2:20-cr-0146-WFN-1; time set for

4  sentencing.  Participating by listen-only mode is Probation

5  Officer Carrie Valencia.

6        Counsel, please state your presence for the Court and

7  record, beginning with the government.

8        MS. GREGOIRE:  Good morning, Your Honor.  Alison

9  Gregoire for the United States.

10        THE COURT:  Good morning, Ms. Gregoire.

11        MS. RUBIN:  Good morning, Your Honor.  Amy Rubin on

12  behalf of Mr. Jaiden Petersen, who is seated beside me today at

13  counsel table, and also joining me at counsel table is Brenda

14  Challinor.

15        THE COURT:  Good morning, Ms. Rubin, Mr. Petersen,

16  Ms. Challinor; good to see you.

17        This is the time set for the sentencing, and the Court has

18  reviewed the presentence report prepared by Ms. Valencia, who is

19  on the phone, as Ms. Knutson mentioned.  I think she's in her

20  office in Yakima.  Also, the Court has reviewed the briefing by

21  the government as well as the brief submitted by Ms. Rubin on

22  behalf of Mr. Petersen, and the Court's reviewed, of course,

23  that presentence report as well as the plea agreement itself.

24        And for the benefit of those in the courtroom, the plea

25  agreement is basically a contract that was entered into between

1  the government and Mr. Petersen, the defendant.  And this is

2  what we call an 11(c)(1)(C) agreement, which means that the

3  parties have agreed that a sentence imposed within a designated

4  range of months would be an appropriate sentence.  Then it's up

5  to the Court to decide, first of all, whether or not the

6  agreement is reasonable; and, second of all, if the Court

7  determines it is reasonable, what the sentence should be within

8  that range.  And for the record, I should say that the Court

9  feels the plea agreement is reasonable and accepts it.

10      So let's talk about the presentence report.  That is a very

11  detailed report that Ms. Valencia prepared.  It's very well-

12  done, and it goes in great detail into the background of this

13  case, great detail, as well as the background of the defendant

14  himself.  Copies of the presentence report were given to the

15  government, to Ms. Rubin on behalf of the defendant, and I hope

16  that the defendant was given the opportunity to read it and

17  review it, and I'll ask him about that in a moment.

18      First, I want to make sure that if there are any objections

19  to the report that we talk about it.

20      Now, Ms. Gregoire, I'm not aware of the government having

21  filed any formal objection to the content of the presentence

22  report.  Are there any objections to it?

23          MS. GREGOIRE:  No, Your Honor.

24          THE COURT:  Ms. Rubin, same question to you.  No

25  objection filed.  Are there any objections that you'd like to

1  bring to the Court's attention?

2          MS. RUBIN:  There are none.  Thank you.

3          THE COURT:  Did you see that Mr. Petersen had a chance

4  to review the presentence report?

5          MS. RUBIN:  Yes, he has reviewed the document.

6          THE COURT:  Did you read it, Mr. Petersen?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Speak up, please.

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Do you have any objection to the content

11  of the presentence report?

12          THE DEFENDANT:  No.

13          THE COURT:  All right.  Now, normally on a sentencing,

14  I suggest that the defense counsel express his or her reason and

15  suggestion as to the appropriate resolution of the case followed

16  by the government and then ask to hear from the defendant.

17      But according to the briefing, Ms. Gregoire, you indicate

18  you have some witnesses to call or some people that want to

19  visit.

20      So I ask Counsel should we reverse the order and ask the

21  government first and then you, Ms. Rubin, follow up?

22          MS. GREGOIRE:  Your Honor, just with respect to the

23  witnesses, we have present in the courtroom Minor 1's mother and

24  father as well as grandmother, and they are all aware of their

25  right to speak.  They are having a very emotional day, as the

1 Court can well imagine.  At this time, they have relayed

2 comments that they would like the attorney for the United States

3 to make on their behalf rather than make those comments

4 themselves.  I told them that this Court would be receptive if

5 they change their minds as the hearing is going on.

6          THE COURT:  Well, that's absolutely the case,

7 Ms. Gregoire, and I'm glad the subject of victims comes up.  I

8 trust that all victims in this case have been advised of this

9 hearing and have been given the opportunity to attend and share

10 their thoughts.  Is that the case?

11          MS. GREGOIRE:  Yes, Your Honor.

12          THE COURT:  All right.  And for those people that are

13 in the courtroom, I understand what Ms. Gregoire said, and I can

14 understand a hesitation to come forward and speak.  But if any

15 of you feel that you would like to do so, feel free to do so.

16     And Ms. Rubin, if there's anyone that you feel should speak

17 on behalf of Mr. Petersen, the same applies to you.

18          MS. RUBIN:  Thank you.

19          THE COURT:  So then let's go back.  If anybody wants

20 to speak, now would be a good time, but if --

21     Ms. Gregoire, do you sense that anybody would like to come

22 forward at this time?

23          MS. GREGOIRE:  Your Honor, I think that I will -- we

24 actually, I think, lost one of the people to emotions already,

25 Your Honor.  I -- I can make comments; and then to the extent

1  they think I've left something out, I'd like to afford them the

2  opportunity to supplement.

3          THE COURT:  Well, let's proceed this way, then.

4  Ms. Gregoire, on behalf of the government, you speak first as to

5  your recommendation as to the appropriate resolution of the case

6  and fill in with the background that you've alluded to.

7      Then we'll hear, Ms. Rubin, your position regarding the

8  appropriate resolution of the case, and then I'm anxious to hear

9  from Mr. Petersen.

10          MS. GREGOIRE:  Your Honor, may I confer with Counsel?

11          THE COURT:  Yes.

12                      (Off the record.)

13          MS. GREGOIRE:  Thank you, Your Honor.  As the Court

14  noted, there have not been objections to the PSIR, but I do

15  think that it's worth reflecting just a moment on what that

16  document says in terms of guideline.  Defendant is a 44 for a

17  total offense level.  It's reduced to 43 by virtue of the

18  operation of the guidelines because the guidelines don't go as

19  high as 44.  That would leave him at a sentence to life under

20  the guidelines, but it's reduced further because of the

21  statutory maximums for his offenses; so we have a statutory

22  maximum of 60 years.

23      The government intends to recommend that this Court impose

24  a sentence of 20 years of imprisonment; so one-third of the

25  guideline, which has already been reduced twice, as I indicated,

1   and the government maintains that is not too much given what

2   Mr. Petersen has done in this case.  The government's also

3   asking for a lifetime of supervised release and restitution, as

4   detailed in the PSIR but just to be clear, of $14,400 to Minor 2

5   for counseling services and $3,000 to each of three series

6   victims, as indicated in Paragraphs 33 to 35 of the PSIR, those

7   being Fiona, Jenny, and Tara.

8              THE COURT:  Now, you said 3,000 for each of the three

9   for a total of nine?

10             MS. GREGOIRE:  For a total of nine for the series

11  victims and then 14,400 for Minor Victim 2.

12             THE COURT:  And if I understand it correctly, there's

13  been only one restitution request made other than the series

14  victims.

15             MS. GREGOIRE:  That is correct, Your Honor.

16             THE COURT:  Now, is the period of restitution filing

17  left open for 90 days?

18             MS. GREGOIRE:  It can be, Your Honor.  We have not

19  received a request to leave it open.

20             THE COURT:  All right.  Go ahead.

21             MS. GREGOIRE:  Your Honor, again, the United States is

22  recommending 20 years and does believe that's sufficient for

23  several reasons that I want to make out.  I want to make clear

24  at the outset because the victims who are present in court

25  desire to make clear to the Court they do not believe that

1  20 years is enough time.  To the extent that the Court has

2  already accepted -- the Court is going to accept the plea

3  agreement, they are advocating for the high end of that

4  agreement.  But at the time the government negotiated the plea

5  agreement, at the time the government has indicated the

6  government is asking for 20 years, at all times they have

7  maintained that is -- that is insufficient for their purposes.

8  They believe that more time would be appropriate, and so I

9  wanted to get that onto the record on their behalf.

10        Your Honor, this case stemmed from a cyber tip.  So it was

11  Snapchat, in this case, indicated to NCMEC, or the National

12  Center for Missing and Exploited Children, that there was child

13  pornography going over Snapchat servers and that it was coming

14  from Mr. Petersen's account.  So having received that

15  information, law enforcement -- and incidentally, the case

16  agent, Andrew Booth of the FBI, also present and in Court today

17  -- obtained a search warrant; and at the time they executed that

18  search warrant, they got a chance to talk to Mr. Petersen.  And

19  Mr. Petersen, during that interview, indicated, yes, that

20  Snapchat account was his; yes, he had been receiving and

21  distributing child pornography for years.

22        They seized his electronic devices at that time, and they

23  subsequently reviewed those forensically, and the FBI found over

24  a thousand images of series child pornography and found

25  additional videos of series child pornography and reviewed

1   those, but they also -- and they also found just in that child

2   pornography that the defendant did not produce, they found

3   another local victim that was prosecuted in the -- his case was

4   prosecuted in the Eastern District of Washington.  So Defendant

5   was also trading locally with other pedophiles.

6        But in addition to all of that, they found images the

7   defendant made.  They found images that the defendant made of

8   three separate children, and those are the production counts,

9   two of which are before the Court, one of which is not, and I

10  want to explain that as well.  So when they found these images

11  that the defendant produced himself, they found two teenagers,

12  who I'll talk about that he's pled to, as well as a six-year-

13  old.

14              THE COURT:  As well as a what?

15              MS. GREGOIRE:  Six-year-old.  And Your Honor,

16  Defendant produced those images of the six-year-old, to whom he

17  is related, when he was just shy of 18 years old, and that is

18  why the Court has a global resolution before it, because that

19  juvenile misconduct -- although he was not long from becoming an

20  adult, that juvenile misconduct is being prosecuted by the state

21  because that's when he produced those images of his six-year-old

22  niece.  But those images that he produced as a juvenile he

23  distributed as an adult.  Those images that he had produced of

24  his niece, he subsequently sent on to other people as an adult.

25        So the reason why I note all of this is because that

1  information is properly before this Court.  That information is

2  properly before this Court to consider.  And I also note that

3  the state sentence as pertains to that six-year-old, pursuant to

4  the global resolution, is going to run concurrent to this

5  Court's sentence.  So this Court can properly consider that and

6  can consider Defendant's relationship with that child, which I'd

7  like to speak to in a minute.

8       With regard to the other two, the other two teenagers, they

9  were 13 years old and 14 years old respectfully at the time that

10 the production occurred.  The older child was a person that

11 Mr. Petersen knew personally and had contact with.  The 13-year-

12 old was a child that Mr. Petersen met on Xbox Live.  And for

13 both of these children, he asked them to produce images of

14 themselves, nude images of their genitalia, images -- videos of

15 them masturbating, and they complied, and Mr. Petersen was found

16 to be in possession of all of that material that had been

17 produced at his behest.

18      Your Honor, I want to make four points with respect to the

19 sentence that's appropriate in this case in turn, and then I'll

20 elaborate.  First, Defendant abused a position of trust to gain

21 access to arguably his most vulnerable victim, to a six-year-old

22 victim.  He was willing to abuse a position of trust.  Second,

23 Defendant abused two vulnerable teenage victims, who he knew to

24 be vulnerable teenage victims.  Third, Defendant maintained this

25 course of conduct not for an instant, not for a day, not for a

1  week, not even for a year, but for an extended period of time;

2  and fourth, the need for strong deterrence in a case,

3  specifically such as this, and what it will take to establish

4  deterrence given these factors.

5      Turning first to the abuse of trust with respect to a most

6  vulnerable victim, Your Honor, this was Defendant's relative.

7  This is his brother's daughter.  And Defendant's brother had

8  Defendant living with him because he had nowhere to go.  And in

9  exchange for that kindness of letting the defendant come in and

10  letting him live with their family, he took advantage of his

11  position and created child pornography images of their six-year-

12  old daughter.

13      And Your Honor, the willingness to abuse a position of

14  trust for such a vulnerable young person cannot be overstated.

15  That is very significant misconduct unto itself.  Before you get

16  to Defendant's years of trading child pornography, before you

17  get to the production with teenagers later on, that he was

18  willing to do this to a family member, having been shown a

19  kindness by his family, is very concerning and, the government

20  maintains, should be very concerning for this Court.

21      Defendant took images of this child of her unclothed groin,

22  of him pressing his erect penis against the sleeping child.  He

23  morphed her face onto other images of existing child

24  pornography, and he disseminated images of this child.  Child

25  pornography images of this child were sent on to other people.

1    And Your Honor, one of the people that these were sent to

2  was a teenage victim of the defendant, and I want to talk first

3  about Minor Victim 2, who was 14 years old when the first images

4  were produced.  And Defendant, through the chat, makes obvious

5  he knew she was 14.  She reports that he had stated he liked

6  that she looked so young.  He asked her for nude pictures and

7  videos of her masturbating, and she complied, and Defendant was

8  found in possession of those materials.

9    Defendant, through Xbox Live, met Minor Victim 3, who was a

10  troubled 13-year-old.  She was in middle school.  The defendant

11  knew she was in middle school and knew she was 13 because she

12  told him, and I believe he had even commented that he had gone

13  to that same middle school.  He said he could get in trouble for

14  talking to someone who was so young.  He said he could get in

15  trouble for meeting her, but he did ask to meet her repeatedly.

16  Luckily, she did not agree to meet with him.

17    And Defendant did not do this, Your Honor, as a lapse in

18  judgment or as an ethical slip.  Defendant did this for years.

19  This is not a brief moment in time.  This is a course of

20  misconduct.  He said he had been viewing child pornography since

21  he was 12.  He said he had last viewed child pornography

22  approximately two days prior to the search warrant being

23  executed in this case.

24    So this has gone on for a long time, and he had over a

25  thousand images and videos that he did not produce that included

1  bondage with respect to these children and urination and

2  bestiality, and those victim impact statements have been

3  included in the presentence investigation report, and I will not

4  repeat all of them here.  I summarized some in our sentencing

5  memorandum, but they talk about the impact, Your Honor, and what

6  this Court can anticipate is the impact to victims of production

7  of child pornography.

8       They talk about -- these kids talk about how they -- they

9  have great concern when they're just walking down the street;

10 that if anyone does a double-take at them, it's because they

11 assume that person saw them being raped on the internet.  And

12 they talk about how living like that causes them to not trust

13 anyone and to fear everyone that they don't have a previous

14 relationship with.  And this impact is great, and this impact is

15 lasting, and he contributed to the impact on these series

16 victims, and he created new victims himself.

17      And all of that is tremendously serious, Your Honor,

18 because as long as he was -- he was viewing/receiving/

19 distributing child pornography, he was also producing it for at

20 least three years that the government can show, and that is also

21 very significant.  Again, this is not a slip.  This is not a

22 brief error.  This is a course of conduct.  This is a person who

23 has a sexual interest in children that they are unable to

24 control, and that moves the government to its next point, the

25 need for strong deterrence in this specific case.

1    This defendant in his young life has amassed thousands of

2  images of series child pornography.  He has created three

3  production-of-child pornography victims, and this is

4  tremendously serious given the time frame that we are talking

5  about.  And the government maintains it will take something very

6  significant to deter additional misconduct in a case such as

7  this, and the government is asking for a very serious sentence

8  here, and the government does not do so lightly.  Twenty years

9  is serious, but it is not too much for someone who has committed

10  this much misconduct, this level of misconduct.

11    Now, the defendant provided materials to the Court through

12  Counsel that detail the defendant's own mitigation and that he

13  had a very rocky childhood himself, and the government has taken

14  that into consideration.  And the government, as this Court can

15  draw on its own knowledge and experience, has often requested

16  more than 20 years in similar circumstances.  The government has

17  absolutely considered Defendant's mitigation, but anything less

18  than 20 years would be insufficient to meet the level of harm

19  here with multiple production victims, with three -- excuse me,

20  with multiple production victims and with many, many more

21  victims still in terms of the child pornography that he was

22  exchanging.

23    The government believes that 20 years will not cause a

24  disparity in sentencing but instead is entirely appropriate in

25  this case.  The government asks for the 20 years as well as the

1  lifetime of supervised release, which is also recommended under

2  the guidelines, as well as the restitution that I previously

3  spoke to.  And unless the Court has questions for me, I will

4  just check with -- I apologize.  Go ahead, Your Honor.

5            THE COURT:  No questions.

6            MS. GREGOIRE:  And I will just -- may I have just one

7  moment?

8            THE COURT:  You may.  Yes, you can.

9                      (Off the record.)

10            MS. GREGOIRE:  And Your Honor, the victims present

11  have been consulted with, and they do not desire to make an oral

12  statement to the Court at this time.  Thank you.

13            THE COURT:  Thank you.

14        Ms. Rubin.

15            MS. RUBIN:  Thank you.  Your Honor, before I get

16  started, I do actually have a video I'd like to play for the

17  Court.  Mr. Petersen's sister was available for the last

18  hearing, but it is very hard for her to get off of work; so she

19  had taken day off, and then I know we had to postpone it.  So

20  she has asked if we could play this video.  I informed

21  Ms. Gregoire this morning.

22        We received the video last night.  It was in pieces just

23  because you cannot send that big of a video -- I think it's

24  about ten minutes or so -- and then we just simply put her clips

25  together, and we've made a video.  And if I could play that now,

1  I would like to do so, and then I can make my presentation for

2  it.

3           THE COURT:  You may.

4           MS. RUBIN:  Thank you.  And when I say "me," I

5  actually mean my colleague, Martin, because I know nothing of

6  what to do up here.

7                    (Video played.)

8           MS. RUBIN:  Your Honor, it's interesting because when

9  I thought about what I was going to say to the Court even before

10 we got this video last night, the first thing I thought of was

11 he never really stood a chance against the system.  I think if

12 there's anything that we take from certainly what we know that

13 these young children were exposed to and the life that they

14 experienced, I think that there is absolutely no doubt that

15 whatever consequences may occur, Jaiden recognizes that that is

16 going to be an important piece of this, but I think what is

17 equally, frankly, as important is the treatment that follows.

18      I had a conversation with Jaiden yesterday when he just

19 arrived back to Spokane, and it was interesting.  He had just

20 arrived back to Spokane.  We let him know we were going to try

21 to see him last night at the Spokane County jail, and as Sierra

22 so just, I mean, appropriately said, the last question that

23 Jaiden asked me on the phone was, "Well, how are you, Amy?  How

24 are you doing?"

25      There is kindness in this young man's heart.  There is good

1  in this young man's heart.  Obviously, what has happened in this

2  case is horrific.  There is no one in this courtroom, frankly,

3  that feels, I think, worse than Jaiden Petersen.

4      I came into this case about three-and-a-half years ago, I

5  think, actually before Ms. Gregoire had brought this case

6  federal, and I was reached -- I was contacted by the public

7  defender who represents Mr. Petersen, Jaiden, at the state

8  level, Jeff Leslie.  And I remember he walked out of the -- he

9  was walking out of the jail and I was walking in.  He said,

10  "Amy, I have a young man and I think this case may go federal,

11  and I hope that you will jump on board because I think this

12  young man really needs some help.  He has been through an awful

13  lot, and we need to figure out a way to help him."  And so even

14  before we got this case before this Court, I was visiting with

15  Mr. Petersen.

16      And I will tell you that three years ago -- I think it's

17  been 36, 37 months -- from the outset, from the beginning of

18  this case, he has always said, "I want help, and I need to

19  understand why this happened.  I need to understand how this

20  happened because I am not a bad person.  I did not mean to do

21  bad things.  I just need to understand how to get better."  And

22  so I applaud him for that because that has been three years.

23  That is not just standing and talking -- talk to the Court,

24  hoping that this Court will give him the sentence that we are

25  requesting.  That has been ongoing from day one.

1    But this Court also knows that those treatment options are

2  very limited, and they really don't exist.  Perhaps you can call

3  mental health and say, "I can't sleep well."  Perhaps you can

4  call mental health and say, "I'm having bad dreams."  Perhaps

5  you can call mental health and say, "I'm feeling down today,"

6  and they'll give you a pill and that's the extent of it.  So

7  there is no treatment.  So to get better, we are going to have

8  to get that treatment.

9    I don't want to belabor this because I think this Court is

10  so incredibly well-educated, and -- and I think Ms. Gregoire

11  would agree with me.  We have all seen the statistics.  We have

12  all seen the research.  We know that young people's brains don't

13  develop until their mid 20s.  And the fact that much of what

14  occurred in this case happened when this young man was in his

15  teens and then into perhaps just when he had turned 20, I think

16  we have to be cognisant of the fact that his brain, probably not

17  fully developed.  We also know there were delays in school, and

18  we also know that he suffered from severe trauma.

19    So with all that said, I ask the Court to keep that in mind

20  as we go through this process to determine what this Court

21  believes is the appropriate sentence.  I know on paper it's easy

22  to say, "You've done awful things and you are an awful person."

23  And as I said, there's no one who feels worse about this than

24  Mr. Petersen.  But I'm also asking this Court to be mindful that

25  this young man has so many other things that he has experienced

1  that I truly believe led to this behavior, and I truly believe

2  that with the right treatment and with a sentence that

3  incorporates not only consequences but treatment, we can get him

4  to a place that he feels as good about his life and as good

5  about his progress as we saw with his sister, because what we

6  saw with her is it's possible.

7          THE COURT:  Do you have an institution in mind?

8          MS. RUBIN:  I do.  I do.  And I'm going to talk about

9  that, and I'm happy to share with the Court.  That institution,

10  actually surprisingly, Your Honor, is FMC Bevens -- Devens.  I

11  apologize.  It's in Massachusetts, and it is actually primarily

12  a facility for sex offenders.  But what's wonderful about Bevens

13  -- or Devens -- I apologize -- that is a little different than

14  what we've seen with, let's say, Englewood is that Devens has a

15  residential sex offender treatment program.  Englewood, on the

16  other hand, has a nonresidential treatment program.

17      What's the difference?  The difference is a residential

18  program is going to be far more intense.  It's going to take

19  about 12 to 18 months to complete.  It's usually three to four

20  days a week.  Whereas the nonresidential is maybe a couple of

21  days a week, doesn't take as long to finish, and is not as

22  intensive.  And I think in this case, we need the intensive

23  component of it.

24      What else does FMC Devens offer?  It offers a culinary

25  program.  It offers actually some other computer programming,

1  but it also offers GED classes, which I know that Mr. Petersen

2  is anxiously awaiting to complete his GED and get that done.  So

3  we will be recommending Devens as placement in this particular

4  case.

5       I want to tell the Court that when we ordered the CPS

6  records, I have received to date about eleven to twelve hundred

7  pages.  And in that 1,200 pages, that only went from the time

8  that Jaiden was about a little shy of two until he was nine; and

9  we just asked CPS at that point in time to kind of stop because

10  we had seen so many records, we were certainly familiar with

11  what was going on, but I want to share with the Court just a

12  couple of things.

13       On August 23rd, 2002, the referrer indicated the individual

14  who went out to check the house -- and let me just say this,

15  Your Honor.  Mr. Petersen's mom is in the courtroom, and I

16  certainly don't want to in any way disparage her because life

17  was hard for this entire family.  I'm going to talk about some

18  hard things, and it's not my intent to embarrass or to hurt

19  someone's feelings, because his mother is clean and sober now

20  and that is something to be incredibly proud of.  So as I go

21  through this, please, I don't want anybody to think I'm trying

22  to be disrespectful, but I think it's important for the Court.

23       In August of 2002, the notes say the home is constantly

24  filthy with inappropriate dangerous items left within the reach

25  of a smaller boy, this young man right here.  There have been

1    two incidents in the last seven to ten days.  The mother was

2    home, in the home not watching the children.  Jaiden jumped off

3    something and cracked his head open.  Initially, the mother

4    refused to take him to the hospital.  However, police responded

5    and insisted.  Jaiden needed stitches.  The mother and the

6    individual at the time who was living in the home, the father of

7    one of the kids, Greg Smelcer, they drink; they fight; and on

8    many occasions, police have responded.  The worker completing

9    this referral is very concerned for the welfare of the kids due

10   to the mother's lack of supervision of the children and basic

11   lack of parenting skills.  Investigation, no removal of these

12   children.

13       In September of 2002, a sergeant from Spokane law

14   enforcement contacted aftercare -- after-hours care requesting

15   placement for the children.  The mother was drunk on the couch.

16   The house was a pit, and she had been on a binge for days, no

17   food in the house.  There have been three CPS calls this past

18   week.  Jonathan, his older brother, was not there because he was

19   adopted by their maternal grandmother, the same grandmother who

20   put Jaiden and Sierra in a basement with canned food and told

21   them they could eat if they could open the cans.

22       They tried to place Jaiden with his grandmother and James

23   Ervin, who is his father, but they will not be an appropriate

24   placement.  Grandmother was contacted, said Jonathan was with

25   her and had been with her since his birth.  He had never been

1  with Marci.  Jaiden and Kaitlyn at that point in time were

2  placed with a provider for a short period of time.

3       In July of 2003, a referrer indicated that a child came to

4  daycare with two bruises with a bit of a scrape by his right eye

5  above about the size of a thumb.  He said his mom "hit me."

6  "She hit me.  She was mad and she hit me."  Only an

7  investigation.

8       In March of 2004, Jaiden is five years old.  The referrer

9  says -- the person who's contacted CPS, presumably a neighbor --

10 Jaiden always goes to the bathroom outside on a daily basis.

11 She's concerned because he's playing in the street.  Nevada is a

12 busy street.  He played in the street throughout the weekend.

13 She heard the father of one of the kids, this guy Greg, telling

14 Jaiden he was going to bash his head in.

15      In April of 2004, just a month later, Jaiden is just a

16 little -- again, five years old.  Police have now been to

17 Marci's house three times, first came due to a DV incident that

18 involved their uncle and a girlfriend.  The uncle was arrested

19 and removed from the home.  Police came back a second time

20 because the DV victim had overdosed using drugs and alcohol

21 along with his mother, Marci.  The aunt had to be taken to the

22 hospital.  Marci was left alone with her own children.  Police

23 came back and discovered she was intoxicated, no food in the

24 home.  They determined the home was not clean enough for the

25 children and Marci was not able to care for her children.  Just

1  two months later, five-and-a-half years old, he's found riding

2  his bike on Nevada Street.

3       In July of that year, he's not being supervised by -- in

4  the home because of drug use, unsanitary living conditions.

5  Someone is watching two children leave the house drinking beer,

6  and they are approximately two and four years old.  Four days

7  later, Nathan was at home, the older brother, yelling at his

8  brother -- yelling at Jaiden, who was being sexually abused by a

9  neighbor kid.

10      November of 2004, it is reported that one of the brothers

11  may have exposed himself to Jaiden and another five-year-old in

12  the neighborhood.

13      In March of 2005, Jaiden is at the foster placement.  He is

14  yanked off the top of his bunk bed by his arm.  He was pushed

15  into a wall by the foster mom because he couldn't find his other

16  shoe, and he had a knot on his forehead, and he had begun

17  wetting the bed nightly and urinating on the bedroom floor.

18      In June of 2006, he's now seven-and-a-half years old.  CPS

19  takes him from his mother in January of 2006, gives him to his

20  father because -- and this is the same father who's put him in a

21  highchair, and he and the girlfriend thought it was funny to

22  vacuum him -- because she was using drugs and alcohol, not

23  supervising Jaiden.  The referrer says, "Father has abandoned

24  Jaiden.  Return him to his mother," two days later.

25      He had been observed riding his bike on Francis with no

1  helmet.  He continues to use the bathroom outside, and the

2  referrer -- Jaiden told the referrer that his mother and

3  boyfriend have sex in front of him in their bedroom, and

4  sometimes Jaiden takes a bath with his mom and "plays with her

5  boobs in the bathtub."

6      In September of '06, Marci is drinking alcohol and abusing

7  controlled substances, and they don't believe that there's any

8  condition to provide -- she's in any condition to provide

9  supervision or care for her son Jaiden.  The referrer again sees

10 Jaiden running up and down the street.  He's outside.  It's

11 9:30 p.m.  He's observed yet again going to the bathroom

12 outside, and the referrer says that Marci, the mother, is now

13 purchasing alcohol for teenage children, and she's drinking and

14 driving with children in her car.

15     October of 2006, younger children -- presumably Jaiden and

16 his younger sister Kaitlyn -- observed outside throwing rocks

17 and jumping off a car parked on a busy street.  The kids went

18 inside after that, and the referrer goes to the home and hears

19 the children yelling, "Don't stab me.  Don't stab me.  I'm

20 cold."  The referrer observed the living conditions.  Home

21 smelled of dog urine and marijuana, garbage and beer bottles

22 covering the floor.  A woman is passed out on the couch.  The

23 children all have dirty clothing on, and the young boy, Jaiden,

24 tells her that the older child -- the older brother is trying to

25 stab him with a knife.

1      November of 2006, Marci and now her mother, the

2  grandmother, are living together.  A restraining order is taken

3  out against Marci's boyfriend.  The past summer, Jaiden reports

4  to the CPS worker that he had watched the boyfriend -- and I

5  quote from the report -- "finger-bang his mom in the living

6  room."  And then the grandmother takes the children out of the

7  room while Marci and her boyfriend, the mother, are using drugs

8  in another room.

9      By November of 2007, there are 32 referrals to CPS, and the

10 notes are that Marci is leaving drugs and paraphernalia in the

11 children's reach and presence.  She's described as having sores

12 all over her face.  She's having her 17-year-old, presumably

13 Nathan, pick up the kids and take them in a vehicle.  He has no

14 license, no -- no insurance, no car seats.  Jaiden is eight, and

15 Kaitlyn is four-and-a-half.

16     In 2008 in March, Nathan is 18 and apparently living at the

17 home.  Referrer says that he has drugs and paraphernalia in the

18 reach of his siblings.  Marci knows, will not do anything.

19 Marci is pregnant again, and all kinds of traffic are in and out

20 of the house.

21     By 2008, there are 43 referrals.  Marci is the subject of

22 17.  And what the referral summarizes, lack of supervision,

23 filthy house, lack of basic needs, mom's drug use, inappropriate

24 sexual conduct by siblings and mother.  Mother has been found

25 drunk on the couch on binges, no food in the house.

1       In 2009, a new baby is born, Elijah.  Multiple adults are

2    in the home using drugs.  Jaiden and his sister are exposed to

3    this.  Now the new baby is exposed to this.  Jaiden and Kaitlyn

4    are outside running around, no adult supervision.

5       These were just some of the incidents with CPS in eleven

6    CPS installments with 1,159 pages, and we stopped, and this only

7    covered Jaiden until he was nine.  There are at least nine more

8    years of CPS involvement that we don't even have because the

9    records were so overwhelming.

10       So one wonders would we be in this situation today if, like

11    Sierra, he had been adopted by a good family who recognized the

12    need for counseling and treatment?  One wonders if just at some

13    moment in time after 43 times that CPS responded to this house

14    when this young man was nine years old, would we be here today?

15    I don't know that we would.  This young man has endured trauma.

16    And I am not suggesting that the other kids haven't, but there

17    is a distinction, and that distinction is this.

18       He was always -- with the exception of a few different

19    times where he was placed with foster care or a couple of times

20    when his father decided to be a dad and take responsibility but

21    couldn't handle it and gave him back two days later -- he was

22    with his mom.  Nathan was already out of the house.  Jonathan

23    was adopted by his maternal grandmother, and Sierra was living

24    with this foster care placement more often and then ultimately

25    adopted by this woman who used to see these young kids, Jaiden

1    and Sierra, go to school in the snow with no shoes on because

2    there was nothing to provide for them.

3         So while, yes, I don't disagree with Ms. Gregoire that

4    consequences are absolutely vital to this case, there is also a

5    purpose and a need for rehabilitation and treatment; and in many

6    ways, I think it's even more necessary, knowing what we know

7    about this young man and the things that he has gone through.

8    He doesn't know how to have healthy relationships, and I think

9    we can understand why.  He, of course, seems to gravitate

10   towards younger people in their teenage years, and I think it

11   makes sense now that we know the history of his exposure to

12   sexual abuse by family members, to sexual trauma by family

13   members, to physical abuse, to neglect.  So I think it becomes

14   more apparent that in this particular case why treatment is

15   going to be such an important piece of this.

16        So I don't know where we would be if perhaps CPS had done

17   their job and perhaps a better job, but we are here today.  But

18   as Sierra said, she is a living example that you can make

19   changes.  You can -- with treatment, people can get better.  And

20   this Court has absolutely seen that in its own, you know,

21   experiences with people who come before the Court who have done

22   substance abuse treatment and mental health.  Treatment works.

23        And you have someone who wants to engage in it, and you

24   have someone who has wanted to engage in it since the moment he

25   came into custody and said, "I want help.  I don't understand

1  why I've made the decisions I've made.  How do I get help

2  because I want to live a healthy life.  I want that.  I don't

3  want what I've had over the last 21 years.  I want something

4  good.  I want something healthy."

5       He has suffered trauma at the hands of his family, his

6  mother, his father, his brother, his foster parents.  This is

7  not in dispute.  And certainly he will suffer again, of course,

8  even more at the hands of the system, but we have an opportunity

9  to make things right.  So what do we do?

10       We are asking this Court to sentence him to 15 years, and I

11  want the Court to understand that treatment is not you get to go

12  into BOP custody and they start treatment.  This treatment, just

13  like the stuff at BOP in Englewood, is not available until you

14  get to two to three -- two to three years shy of your release.

15  So if this Court gives him a 15-year sentence, he still has at

16  least seven to eight years in custody before he's even eligible

17  for programming.  If he gets a 20-year sentence, you are talking

18  14 years before he -- well, probably 13 years before he is even

19  eligible for programming.

20       I am begging this Court to think about the impact treatment

21  can have on a young man who's in his mid 20s and how we know

22  that this is the most important time for him; and the sooner we

23  can get the treatment, frankly, the better.  He will have -- if

24  the Court gives a 15-year sentence, he has done about

25  three years.  He will have at least seven or eight to do before

1  he's even eligible.  So he'll work on his GED.  He'll work on

2  getting a job.  He'll work on vocational training.

3      But what is the most important part so he gets healthy?

4  Because everybody in this courtroom wants him to get healthy.  I

5  don't think anyone's going to be disagreeing with me on that.

6  Everybody wants him healthy.  Then let's get it as soon as we

7  can, and to get it as soon as we can means we have to look at

8  the 15-year sentence.

9      He's 24 years old.  He has done three years in county jail.

10 He has never had an issue in county jail.  He has been

11 absolutely 150 percent compliant.  He has been at three county

12 jails.  He has been -- he has done everything that has been

13 required of him.  He has never deviated or had any sort of

14 issues with correctional officers, other inmates.  He has been a

15 model inmate.  So he can do this.

16     I'm asking this Court to consider let's start the process

17 of healing him sooner.  He will do the seven or eight years as a

18 consequence, and that is -- that is -- certainly if he hasn't

19 been deterred in that amount of time, I don't know that we can

20 save him, but he's worth saving.  He's worth saving.  He didn't

21 stand a chance in the foster care system, in the CPS system, but

22 he stands a chance here because we have a chance to help him.

23     Is he remorseful about what happened to the victims in this

24 case?  Absolutely.  These were -- one of them was a family

25 member.  One of them is his brother and his brother's family.

1  Is he remorseful?  Absolutely.  This has destroyed that

2  relationship to his brother who opened his home, hands down,

3  absolutely.  He knows he will never have a relationship with his

4  brother again, and that is devastating to Jaiden.

5       But if we want him to get better because we don't want this

6  to ever happen again, the time is ripe, and I'm asking this

7  Court for 15 years.  He will be on lifetime supervision, and we

8  know those conditions are stringent.  He, after this case, will

9  be, we assume -- and I think Ms. Gregoire and I will work on

10  this probably this afternoon.  He will be writ into state

11  custody where he will then be -- he'll do his change of plea.

12  He will be sentenced for the conduct that occurred with minor

13  victim -- his family member.  He will be sentenced on that to

14  run concurrent with this case.

15       So all of that, we hope, will be said and done so that he

16  will now be on his way to BOP to start the process where he can

17  begin dealing with the consequences, understanding deterrence,

18  which I can assure you he does, but also the last piece of this,

19  which is so important and probably most vital, the treatment

20  part, but that doesn't happen for at least seven years if the

21  Court gives a 15-year sentence and 13 if the Court gives 20.

22       So I'm asking the Court to consider the lower sentence in

23  this case.  It is not a small sentence by any stretch of the

24  imagination, but it is sufficient.  It is not greater than

25  necessary.  I am certainly happy to answer any questions.

1          THE COURT:  The institution you made reference to is

2    Deven, D-E-V-O-N?

3          MS. RUBIN:  It's actually D-E-V-E-N-S, Your Honor.

4    It's in Massachusetts, and it's FMC.  So I think it's actually

5    Federal Medical Center, but it is a -- it is a BOP facility.

6    And my understanding is if it's not all sex offenders, it's

7    primarily sex offenders.

8          THE COURT:  All right.  I'm willing to write a letter

9    to the BOP suggesting that that would be an appropriate

10   institution, but as we all know, the BOP makes the decision.

11         MS. RUBIN:  Sure.  We know that, and, obviously,

12   Mr. Petersen understands it would be a recommendation only.

13         THE COURT:  All right.  Now, I have the calculations

14   that I have to go through for the record.

15         MS. RUBIN:  Okay.

16         THE COURT:  We know that's going to take a few

17   minutes.  I can do that or we can hear from Mr. Petersen first.

18   It's your call.

19         MS. RUBIN:  Do you want me to bring Mr. Petersen up

20   and then the Court could go through the --

21         THE COURT:  Pardon me?

22         MS. RUBIN:  I could bring him up.  We could go through

23   the calculations, and then he could give his allocution.

24         THE COURT:  Okay.

25         MS. RUBIN:  Whatever the Court wants, I'm happy to do.

1           THE COURT:  Stay at counsel table, I'll go through the

2    calculations, and then come on up.

3           MS. RUBIN:  Sure.

4           THE COURT:  I want to explain to the people in the

5    courtroom in the federal system, we have guidelines that have

6    been established by Congress and the Sentencing Commission, and

7    we always consult the guidelines.  They are not mandatory.  We

8    do not -- we're not required to follow them, but we are required

9    to consult the guidelines and go through the formal calculation

10   to come up with the sentence that the guidelines recommend.

11          And in this case, it's kind of complicated.  It's going to

12   take a few minutes, but it is required that the Court go through

13   those calculations.  And all federal crimes have a base offense

14   level that is assigned to the crime, and we always start with

15   that base offense level, and there can be adjustments up or

16   down.

17          And in this case we have two counts, Count 1 and Count 2,

18   and they both charge production of child pornography.  Count 1,

19   the base offense level is 32.  There are two points added

20   because the victims were between the ages of 12 and 16.  Two

21   more points are added because sexual acts were included.  Two

22   more points are added because there was distribution of

23   material.  Two points were added because a computer was used.

24          And then Count 2 is also a production charge.  It starts

25   with a base offense level of 32.  Two points are added because

1  the age is between 12 and 16 of one or more of the victims; two

2  more points, sexual contact was involved.  Distribution was

3  involved for two more points; a computer used, two more points.

4      And those calculations then are grouped together.  There's

5  a process recommended.  And since there were two of them, two

6  more points are added.  It comes to a total of 42 points.

7      And then in this case, unfortunately, it involves a sex

8  crime.  The defendant was engaged in a pattern of activity

9  involving prohibited sexual conduct.  The defendant was a repeat

10 and dangerous sex offender against minors, and those findings --

11 it's clear those findings result in an additional five points

12 added for a total of 47.

13     He accepted responsibility.  It's reduced by three.  And

14 the result is 43 points, not 44 as the arithmetic would

15 indicate, but 43 because that's the maximum number of points

16 that the advisory guidelines use.  It doesn't go any higher, and

17 that sort of says a lot about the seriousness of this offense.

18     So the guideline range is a total of 720 months.  That's

19 60 years.  And that result is reached because each of these

20 counts has a maximum statutory sentence of 30 years, 360 months;

21 and conceivably, they can be run consecutively, end to end, and

22 that totals the 720 months.  And his criminal history is

23 Category I.

24     So it's rather obvious that the seriousness of this crime

25 is taken into account in these guidelines, and the 11(c)(1)(C)

1  plea agreement reached between the parties has an agreed range

2  that is very, very significantly lower than these guideline

3  calculations.

4      Now I think it's an appropriate time to hear from

5  Mr. Petersen.

6      And Mr. Petersen, come on up.  Good morning.

7          THE DEFENDANT:  Good morning.

8          THE COURT:  It's afternoon now.  Good afternoon.

9          THE DEFENDANT:  Good afternoon.  Your Honor, I'd like

10 to take this time to address the Court and to address my family.

11 I want to begin by apologizing to everyone in this courtroom,

12 those who were directly involved and those who were not.

13     I regret that I have hurt my entire family, and I take full

14 responsibility for my actions.  The last thing I would ever want

15 to do was cause pain or to hurt anyone in my family.  I know

16 that I have done both of those things, and I give my word I'm

17 going to do everything I can to better myself.  I love my

18 family, which is why this entire situation has been so

19 difficult.

20     What happened in this case and what happened to the named

21 victims is not okay.  I know this much, but I want to understand

22 why I did these things.  I've spent almost three years in jail,

23 and what I look forward to most is being able to get the

24 counseling and treatment to understand the why.  During this

25 time, I have not had any treatment, and I've not had any

1  counseling, and these are probably the two most important parts
2  of having a successful future, and I want both of these things.
3      I will give every ounce of myself in participating in
4  programs and educational opportunities because the one thing I
5  want for myself and the one thing I want for my family is to
6  come out of this situation healthy.  I need the tools, and I
7  want to learn.  There is no programming in any county jail.
8      I've spent time in Spokane, Kittitas, and Yakima.  However,
9  my time was not wasted.  I worked hard by relearning core math
10 skills and with the hope I can get my GED.  My sister was kind
11 enough to send me books, and I began learning French.  I focused
12 some of the time on my artistic skills, and I have probably read
13 more books in three years than I have in my entire life.  I have
14 read books on everything, and I keep myself busy reading as much
15 as I can.  Even with no programs, I keep myself busy.  I wanted
16 to soak up as much as I can and learn what was available.
17     I also have been trying to address my mental health.  I
18 have struggled with anxiety and depression; and with every move
19 to a new county jail, it requires me to start over and see the
20 doctor, working on getting the correct medication and working
21 towards bettering my mental health.  But I do all of these
22 things because it is important for me and my progress towards
23 bettering myself.
24     While I'm in custody, I want to take programs and classes
25 to help me with the problems I face from this case and my

1  struggles.  Please note that I know not why I've acted upon

2  these actions.  I want to find out the why and learn how to

3  address these issues.  This will be my biggest goal when I get

4  into prison and during my time on supervised release.

5      For the first time in a long time, I'm relieved knowing

6  that I'm finally in a system that wants me -- that wants to help

7  me versus ignore me.  I'm surrounded in a room with people who

8  all have the same goals for me, addressing the consequences of

9  my actions but also finding the right path for me to find a

10  healthy life.  Everyone in this room wants me to succeed, and

11  that feels good.  I believe -- I believe I have a good future

12  ahead of me, and I look forward to work that comes with this.  I

13  want the treatment and the counseling to be able to understand

14  the decisions I made and understanding the tools I need to live

15  a healthy life.

16      I want to say how sorry I am to the victims in this case

17  and my brother Nathan and his family.  I know my words may not

18  be much right now, but I will use this time to be a better

19  person.  I never want to hurt any of you, and I'm so sorry what

20  has happened.  I hope there will be a time when you can forgive

21  me, but I know that forgiveness must be earned.

22      I want to thank my sister and my mom.  Both -- both stood

23  behind me and supported me in what has been the most difficult

24  situations in my life.  This has never -- they have never judged

25  me and shown me nothing but love.  I'm so thankful for their

1  support, especially my sister Sierra.  Her kindness and her

2  words of encouragement have kept me going and have kept me

3  strong.

4      Judge Nielsen, I'm asking you with the chance to show this

5  Court and show my family I have what it takes to be successful.

6  I'm 24 years old and have been in custody since I was 21.  This

7  has not been an easy journey, but a journey where I continue to

8  learn more about myself every day.  I'm not proud of the things

9  I've done, but I am hopeful to be a better person.

10     I hope you will consider a 15-year sentence.  I will be

11 about 34 when I get out, and I assure this Court that I will

12 take the next 10 to 11 years to better myself each and every

13 day.  Thank you.

14         THE COURT:  Well, that's well-stated.  This is a very,

15 very sad situation.  There's no question about it.  The video

16 from your sister was descriptive of your background, very

17 unfortunate.  You grew up in an environment raised by your

18 mother.  A father figure was basically absent in an environment

19 of drugs, alcohol, sex, violence, yelling, the lack of

20 stability, sexual activities, foster homes.

21     There's no question that, Mr. Petersen, you didn't receive

22 an upbringing that had the advantages that a lot of us have

23 enjoyed.  And, of course, I -- this Court had no part to play in

24 the negotiations that resulted in this 11(c)(1)(C) agreement,

25 but I can't help but conclude that the -- first of all, as I'll

1  explain in a minute, the seriousness of this conduct could

2  easily result in a sentence that's much greater than even the

3  top end of the guidelines, and I can't help but believe that

4  your background, your age was influential in resulting in a plea

5  agreement that could be considered advantageous.  Those are

6  mitigating factors, and they're important.

7       But this, of course, was a very serious series of offenses

8  that resulted in these two counts of production, and your

9  conduct will have an adverse effect, psychologically primarily,

10 on the lives of your victims, and your conduct imposed on them

11 some of the disadvantages that you suffered through.  And your

12 conduct went on for a long period of time and, as you heard me

13 say in the calculations, that there was a pattern that kept

14 repeating itself.

15      There were a number of victims.  At least one of them would

16 be considered a family member.  There was a breach of trust.  I

17 don't remember which one it is.  There's the type of conduct

18 that has been charged in state court, multiple victims, and they

19 were young and very vulnerable.  So not only were they victims,

20 but their family members also are victimized as a result of it.

21 It's a breach of that family trust.  And you accumulated

22 literally thousands of images, and you -- some of those images,

23 you created and produced yourself and distributed using the

24 technology that was available to you.

25      So the Court has taken into account -- must take into

1  account your background, the type of person you are.  And I will

2  add that I know you're remorseful, and I know you want

3  treatment, and you need treatment, and hopefully you'll get it,

4  and that's a factor that's taken into account on this sentence.

5  So the Court has to come up with just punishment, and we take

6  into account not only your background and the seriousness of the

7  offense, but the need to protect the public.

8      Crimes of this type oftentimes are committed by people that

9  have a very high level of recidivism.  And I'm not saying that

10 to suggest that that is what you would do, but there has to be

11 deterrence not only by you, but there has to be a recognition by

12 the general public that this kind of conduct is taken by the

13 public to be extremely serious and hopefully discourage or deter

14 others from even being tempted to do it.

15     There has to be respect for the law, and, of course, we

16 always try to avoid disparate treatments.  In other words,

17 individuals that have been found guilty of similar conduct and

18 are similarly situated should be treated somewhat similarly, and

19 those guidelines that I talked about are an attempt to reach

20 that goal.  So there has to be just punishment which is

21 sufficient but not too much.

22     Now, Ms. Rubin, I commend you.  You do a fabulous job, and

23 I know Ms. Challinor and others in your office have worked hard.

24 But as I indicated, the seriousness of this and the effect on

25 others and the result of this 11(c)(1)(C) agreement, I feel that

1 the top end of the agreement is a just sentence.  It's

2 sufficient but not more than is necessary.  But the impact of

3 others and the length of time involved and the factors that I've

4 taken into account, I think, make that an appropriate sentence.

5      So 240 on each count, 1 and 2, to run concurrent, and

6 that's a -- that's a big variance downward, and I applaud you

7 and the government for working diligently over the past several

8 years to work this out and avoid a trial.  Supervised release,

9 life on each of the two to run concurrent.  On a finding of --

10 we waive a fine, no assets, and there are going to be other

11 monetary requirements.

12      Now, restitution we talked about a few moments ago, and

13 there's been only one claim so far, and that's $14,400, and that

14 will be restitution.  There is a requirement for up to 3,000 for

15 each of the series; that's the Vicky and one of the others.

16      And Ms. Gregoire, you indicated that that's each of the

17 three at 3,000 a piece, and that's pursuant to the Justice for

18 Victims Act; is that correct?

19      MS. GREGOIRE:  No, Your Honor.  That would be an

20 assessment.  This is pursuant to the Amy, Vicky, Andy Act, and

21 it's -- yes, it's a minimum of $3,000 for each series victim,

22 and so the United States is asking just for that minimum and

23 only for the three that requested it.

24      THE COURT:  All right.  So that's a total of 9,000,

25 and that's the AVAA, the abbreviation for that statutory act.

1  So there's 9,000 for those and the 14,000 on the restitution and

2  waive interest on all of them, and then there is the $100

3  special assessment for each of the counts for a total of $200.

4      Now, there are standard conditions of supervised release

5  that will apply, Mr. Petersen, and then there are a long list of

6  special conditions, all of which are set forth in the

7  presentence report.  I think there are a total of 30 of them.

8      I don't see a need to go through each of those here in

9  court unless you wish to do so, Ms. Rubin, but they're all

10 spelled out.

11          MS. RUBIN:  Your Honor, we've reviewed them, and I

12 will review them again.  I know that -- I'm sorry.  We have

13 reviewed them.  I will review them again.  I know that

14 Mr. Petersen will be hopefully housed at the Spokane County jail

15 so we can address the state issue.  So I will make sure to go

16 visit him and just go through everything again, but we have

17 already reviewed that with him.

18          THE COURT:  I think that's appropriate.  Now, in the

19 plea agreement, there's a reference to forfeiture.

20          MS. RUBIN:  There's no objection, Your Honor.

21          THE COURT:  And is there an order of forfeiture

22 prepared?  I assume that's for electronic equipment and a thumb

23 drive and that sort of thing.  Oh, here it is.  Here it comes.

24 Any objection, Ms. Rubin?

25          MS. RUBIN:  No.

1          THE COURT:  I'm signing it.

2      Now, you've waived your right to appeal because the Court

3  has accepted the plea agreement.  I will write a letter to the

4  BOP suggesting that an appropriate institution would be this

5  Deven, D-E-V-E-N, and it's in Massachusetts.

6          MS. RUBIN:  I think it's Devens, D-E-V-E-N-S.

7          THE COURT:  Oh, "S".  There's an "S" on the end of it.

8  Okay.  I'll look it up in the book.

9          MS. RUBIN:  And if the Court would be willing to

10  specify that we want him to participate in the residential sex

11  offender treatment, I think that that's probably the key to

12  distinguish Devens from some of the other facilities.

13          THE COURT:  I will make that reference in the letter.

14          MS. RUBIN:  Thank you.

15          THE COURT:  And send a copy of it to you.

16          MS. RUBIN:  Thank you.

17          THE COURT:  Counts 3 and 4, Ms. Gregoire?

18          MS. GREGOIRE:  Yes, Your Honor.  The United States

19  moves to dismiss those at this time.  And then just before I

20  forget, the Court previously referenced the JVTA.  The United

21  States believes Defendant to be indigent and asks that any fine

22  pursuant to that be waived.

23          THE COURT:  Yes.  I so find he is and would waive

24  that.

25      Is there anything else, Ms. Rubin?

1            MS. RUBIN:  Your Honor, I would just simply ask that,

2    obviously, he get credit for time served.  I think he's in

3    primary federal custody.  There shouldn't be an issue, but I

4    want to make sure he gets credit from the time he came in on his

5    arrest.

6            THE COURT:  He does get credit for time served, and

7    that will be referred to specifically in the judgment.

8            MS. RUBIN:  Thank you.

9            THE COURT:  Ms. Knutson?

10           (Off-the-record discussion with court staff.)

11           THE COURT:  All right.  Well, good to talk to you,

12   Mr. Petersen.  It's a tough time, and I know you're remorseful,

13   and I took to heart your comments.  They were well-stated.  It's

14   not going to be easy for you the next few years, but you do have

15   the prospect of a good life.  I wish you the best.

16           THE DEFENDANT:  Thank you.

17           THE COURT:  We're in recess.

18           (Court adjourned on June 7, 2023, at 12:26 p.m.)

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3        I, ALLISON R. ANDERSON, do hereby certify:

4        That I am an Official Court Reporter for the United States

5   District Court for the Eastern District of Washington in

6   Spokane, Washington;

7        That the foregoing proceedings were taken on the date and

8   place as shown on the first page hereto; and

9        That the foregoing proceedings are a full, true, and

10   accurate transcription of the requested proceedings, duly

11   transcribed by me or under my direction.

12        I do further certify that I am not a relative of, employee

13   of, or counsel for any of said parties, or otherwise interested

14   in the event of said proceedings;

15        DATED this 23rd day of August, 2023.

16

17   _____
     ALLISON R. ANDERSON, RMR, CRR
18   Washington CCR No. 2006
     Official Court Reporter
19   Spokane, Washington

20

21

22

23

24

25